**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 17-cv-01937-WYD-NYW

MICHEAL BACA, POLLY BACA, and ROBERT NEMANICH,

     Plaintiffs

v.

COLORADO DEPARTMENT OF STATE,

     Defendant.

---

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS**

---

*/s/ Jason B. Wesoky*
Jason B. Wesoky
1331 17th St., Suite 800
Denver, CO 80202
Telephone:  303-623-9133
Fax:  303-623-9129
E-mail:  jason.w@hamiltondefenders.org

Lawrence Lessig
Jason Harrow
EQUAL CITIZENS
20 Armory Street
Brookline, MA 02446
lessig@law.harvard.edu
jason@equalcitizens.us

Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..........................................................................................ii

INTRODUCTION ......................................................................................................1

BACKGROUND ........................................................................................................1

    **A.**    The Mechanics Of The Electoral College: The State Appoints, And The
Electors Perform The "Federal Function" Of Voting For President......................1

    **B.**    Plaintiffs Are Selected As Electors And Consider Their Votes. ...........................2

    **C.**    The Tenth Circuit Maintains The Status Quo Because It Finds It
"Unlikely" That Any Elector Will Be Removed From Office. .............................2

    **D.**    The Secretary Removes Baca From Office For Casting A Vote For
Kasich, And Refuses To Count The Vote..............................................................3

ARGUMENT ............................................................................................................3

THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE PLAINTIFFS WERE
DEPRIVED OF THEIR CONSTITUTIONAL RIGHT TO VOTE .............................................3

    **A.**    Plaintiffs Have Standing To Vindicate Their Personal Rights To Vote. ...............4

    **B.**    Plaintiffs Have Stated A Claim That The Secretary Unconstitutionally
Interfered With Plaintiffs' Right To Vote.............................................................6

        **1.**    Colorado May Not Interfere With Electors' Performance Of Their
Federal Function...........................................................................................6

        **2.**    The Power To Appoint Does Not Imply The Power To Control. .................8

        **3.**    The Constitution's Text Gives Electors Discretion To Choose Their
Preferred Candidates. ...................................................................................9

        **4.**    Constitutional Structure Reinforces Elector Independence. .......................12

        **5.**    Longstanding Practice Recognizes The Existence Of A
Constitutional Freedom To Choose..............................................................13

CONCLUSION ........................................................................................................15

# TABLE OF AUTHORITIES

### Cases

*Baca v. Hickenlooper* ("*Baca II*"), 10th Cir. No. 16-1482 (Dec. 16, 2016) ........................... 2, 4, 9

*Bd. of Education v. Allen*, 392 U.S. 236 (1968) ............................................................. 5

*Breidenthal v. Edwards*, 57 Kan. 332 (1896) ............................................................. 14

*Burroughs v. United States*, 290 U.S. 534 (1934) ............................................. 3, 5, 6, 10

*Bush v. Gore*, 531 U.S. 98 (2000) .............................................................................. 6

*City of Hugo v. Nicholas*, 656 F.3d 1251 (10th Cir. 2011) ............................................ 5

*Coleman v. Miller*, 307 U.S. 433 (1939) .................................................................. 4, 5

*Columbus & G. R. Co. v. Miller*, 283 U.S. 96 (1931) .................................................... 5

*Cooke v. Hickenlooper*, No. 13-cv-1300, 2013 U.S. Dist. LEXIS 168806
    (D. Colo. Nov. 27, 2013) ........................................................................................ 6

*Faustin v. City & Cty. of Denver*, 268 F.3d 942 (10th Cir. 2001) ................................... 4

*Hawke v. Smith*, 253 U.S. 221 (1920) ....................................................................... 8

*Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114 (10th Cir. 2013) ............................ 4

*Johnson v. Maryland*, 254 U.S. 51 (1920) .................................................................. 7

*Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187 (1956) ................................................. 7, 8

*McCulloch v. Maryland*, 17 U.S. 316 (1819) ............................................................... 7

*McPherson v. Blacker*, 146 U.S. 1 (1892) ........................................................... 1, 3, 11

*Nat'l Bank v. Commonwealth*, 76 U.S. 353  (1870) ...................................................... 8

*Op. of Justices*, 250 Ala. 399, 401 (1948) ................................................................ 14

*Powell v. McCormack,* 395 U.S. 486 (1969) .......................................................... 12, 13

*Ray v. Blair*, 343 U.S. 214 (1952) .................................................................. 6, 9, 10, 12

*U.S. Term Limits v. Thornton,* 514 U.S. 779 (1995) ..................................................... 12

*Williams v. Rhodes*, 393 US 23 (1968) ............................................................................ 1

*Wyoming v. Livingston*, 443 F.3d 1211 (10th Cir. 2006) ................................................. 7

**Statutes**

3 U.S.C. § 7 ...................................................................................................................... 1

3 U.S.C. § 8 ................................................................................................................... 2, 6

42 U.S.C. § 1973i ............................................................................................................. 9

42 U.S.C. § 1983 ....................................................................................................... 1, 3, 4

CRS § 1-4-301 ................................................................................................................. 1

CRS § 1-4-304(1) .......................................................................................................... 2, 6

CRS § 1-4-304(5) ............................................................................................................. 2

CRS 1-4-304–305 ............................................................................................................ 7

U.S. Const. Amd. XII ................................................................................................... 9, 12

U.S. Const. Article I .................................................................................................... 9, 10

U.S. Const. Article II ...................................................................................................... 10

**Other Authorities**

145 Cong. Rec. 203 (1969) ............................................................................................. 14

163 Cong. Rec. H185–189 (Jan. 6, 2017) ....................................................................... 14

Michael Stokes Paulsen, *The Constitutional Power of the Electoral College*, Public Discourse (Nov. 21, 2016) ........................................................................................................... 14

N.Y. Senate Bill S26 (2017–18 Legislative Session) ..................................................... 13

Robert J. Delahunty, *Is The Uniform Faithful Presidential Electors Act Unconstitutional?*, 2016 Cardozo L. Rev. De Novo 129, 153 ................................................................. 14

Samuel Johnson, *A Dictionary of the English Language* (3d ed. 1768) ....................... 10

Saul Levmore, *Precommitment Politics*, 82 Va. L. Rev. 567 (1996) ............................. 8

The Federalist No. 57.............................................................................................................. 10, 11

The Federalist No. 60................................................................................................................ 7

The Federalist No. 68.............................................................................................................. 11

## INTRODUCTION

Plaintiffs Micheal Baca, Polly Baca, and Robert Nemanich were appointed as three of Colorado's presidential electors in the most recent presidential election. They were thus required to perform the federal function of casting electoral votes for President and Vice-President.

During the electoral vote, the Colorado Secretary of State unconstitutionally interfered with Plaintiffs' constitutional right to vote for candidates of their choice. Plaintiff Micheal Baca voted for John Kasich, but his vote was not counted. Instead, he was removed from office, on the grounds that he did not vote the way the Secretary contended he was required to under state law. *See* Compl. ¶¶ 54–55. The two other plaintiffs were unconstitutionally intimidated from casting votes according to their discretion. The Secretary's actions violated Plaintiffs' constitutional rights. Plaintiffs have brought this action under 42 U.S.C. § 1983 to address that violation.

## BACKGROUND

### A.    The Mechanics Of The Electoral College: The State Appoints, And The Electors Perform The "Federal Function" Of Voting For President.

The Constitution does not provide for direct election of the President and Vice-President. Instead, each State "appoint[s]" a number of electors equal to the total number of the State's Members of the House and Senate. *See* U.S. Const. art. II & amd. XII. The Constitution gives states "plenary" power to select electors, *McPherson v. Blacker*, 146 U.S. 1, 35 (1892), subject to the limits of the Constitution, *Williams v. Rhodes*, 393 US 23, 29 (1968). Colorado appoints a slate of electors that are chosen by the political party of the candidates for President and Vice-President that receive the most popular votes in the state. *See* CRS § 1-4-301 *et seq.*

Once appointed, electors meet in the respective states "on the first Monday after the second Wednesday in December next following their appointment," which, in the most recent election, was December 19, 2016. 3 U.S.C. § 7. Both Congress and Colorado law require electors

1

to "perform the duties required of them by the constitution and laws of the United States." CRS § 1-4-304(1); *see also* 3 U.S.C. § 8 (electors vote "in the manner directed by the Constitution").

### B.      Plaintiffs Are Selected As Electors And Consider Their Votes.

Plaintiffs were nominated in April 2016 as three of nine Democratic electors in the State of Colorado. Compl. ¶ 27. Because Hillary Clinton and Tim Kaine received the most popular votes in the state of Colorado in the general election on November 8, 2016, Plaintiffs and the other Democratic electors were appointed as the State's electors. Compl. ¶ 32.

After learning of what many deemed to be credible allegations of foreign interference in the popular election, Compl. ¶¶ 37–38, Plaintiff Nemanich asked Colorado Secretary of State Wayne Williams "what would happen if" a Colorado elector did not vote for Clinton and Kaine. Compl. ¶ 46. The Secretary, through the Colorado Attorney General's office, responded that Colorado law requires electors to vote for the ticket that received the most popular votes in the state, *see* CRS § 1-4-304(5), and an elector who did not comply with this law would be removed from office and potentially subjected to criminal perjury charges. Compl. ¶¶ 46–47.

### C.      The Tenth Circuit Maintains The Status Quo Because It Finds It "Unlikely" That Any Elector Will Be Removed From Office.

In light of the Secretary's response, two of the Plaintiffs brought suit in this Court and requested a preliminary injunction to prevent their removal or any interference with their votes. This Court denied the request, and the Tenth Circuit affirmed. The Tenth Circuit noted, however, that it did not need to answer the question of whether the Secretary could remove electors from office after electoral voting had begun because it thought that "such an attempt by the State" was "unlikely in light of the text of the Twelfth Amendment," which grants electors the constitutional power to vote by ballot for candidates for President and Vice-President. *See Baca v. Hickenlooper* ("*Baca II*"), 10th Cir. No. 16-1482, Slip Op. at 12 n.4 (Dec. 16, 2016); *see also id.*

at 10 n.3 (noting that there is "language in the Twelfth Amendment that could arguably support the plaintiffs' position" that they have constitutional discretion in voting).

### D. The Secretary Removes Baca From Office For Casting A Vote For Kasich, And Refuses To Count The Vote.

Three days after the Tenth Circuit's order was released, the electors convened to cast their votes. When voting began, Micheal Baca crossed out Hillary Clinton's name on the pre-printed ballot and voted for John Kasich for President. Compl. ¶ 54. The Secretary, after reading the non-secret ballot, removed Baca from office, refused to count the vote, referred him for criminal investigation, and replaced him with a substitute elector who cast a vote for Clinton. *Id.* at ¶ 55. Two other Plaintiffs, Polly Baca and Robert Nemanich, felt "intimidated and pressured to vote against their determined judgment" in light of the Secretary's actions and prior statements, including the Secretary's efforts to change the text of the Electors' oath just minutes before they took it. *Id.* at ¶ 56. They thus ultimately cast their electoral votes for Clinton and Kaine.

Following dismissal of Plaintiffs' earlier injunctive action, Plaintiffs filed this suit, which alleges a deprivation of their constitutional rights under § 1983 and requests damages.

### ARGUMENT

### THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE PLAINTIFFS WERE DEPRIVED OF THEIR CONSTITUTIONAL RIGHT TO VOTE

The federal Constitution creates the role of a presidential "Elector," charged with the duty to vote for both President and Vice President. States have "plenary" authority to select those electors. *McPherson*, 146 U.S. at 35. But once chosen, an elector performs a "federal function under . . . the Constitution," *Burroughs v. United States*, 290 U.S. 534, 545 (1934), and is thus free to exercise his or her judgment without state interference. By removing Micheal Baca from office and threatening others with removal, the Secretary violated Plaintiffs' constitutional right to cast an electoral vote for president. Thus, the State's motion to dismiss must be denied.

### A.    Plaintiffs Have Standing To Vindicate Their Personal Rights To Vote.

Plaintiffs have standing. Their lone cause of action alleges they were personally injured by being either removed from office (Micheal Baca) or threatened with removal (Polly Baca and Rob Nemanich) for exercising their constitutional rights. They thus meet the elements for standing in federal court. *See, e.g.*, *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013) (reciting familiar three-part standing test); *Faustin v. City & Cty. of Denver*, 268 F.3d 942, 950 (10th Cir. 2001) (nominal damages sufficient to confer standing in § 1983 suit).

The State claims that the so-called "political subdivision standing" doctrine bars this case on the grounds that plaintiffs may not "challenge the constitutionality of state statutes when they are not personally affected by those statutes and their interest in the litigation is official rather than personal." State Br. 7. But this Court implicitly, and the Tenth Circuit explicitly, have already rejected the same standing argument, and for good reason: as the Court of Appeals understood, Plaintiffs here allege that the Secretary's actions "infringe[d] upon their *own personal constitutional* rights," and they thus have more than an abstract or official stake in the outcome. *Baca II*, Slip Op. at 7 (emphasis added). Like every person whose "own personal constitutional rights" have been infringed, plaintiffs have standing to challenge that infringement through a "civil action for deprivation of [constitutional] rights." 42 U.S.C. § 1983.

Indeed, the Tenth Circuit recognized that Plaintiffs have standing under *Coleman v. Miller*, 307 U.S. 433 (1939). In *Coleman*, state legislators had standing to prohibit the state from interfering with a legislative vote. The Court held the legislators could proceed because they had "a plain, direct and adequate interest in maintaining the effectiveness of their votes." *Id.* at 438. Plaintiffs' interest here is similar to that of the state legislators in *Coleman*: as appointed electors for Colorado, they were entitled to have their votes cast and counted once voting began.

4

Moreover, even if the *Coleman* principle were insufficient to confer standing, Plaintiffs have standing under the State's proposed test. The State acknowledges that Plaintiffs have standing if they can show they were "personally affected" by unconstitutional actions. State Br. 7. But Plaintiffs were removed from office or threatened with removal, and the Supreme Court has held the threat of or actual removal from office confers standing. That is because state officials' "refusal to comply with [a] state law [that is] likely to bring their expulsion from office" gives them a "personal stake" sufficient to confer standing. *Bd. of Education v. Allen*, 392 U.S. 236, 241 n.5 (1968); *see also City of Hugo v. Nicholas*, 656 F.3d 1251, 1260 (10th Cir. 2011) (government officials have standing against state government defendants "based on the individual [plaintiffs'] personal stake in losing their jobs").

This principle applies here with special force because Plaintiffs are not ordinary "state officials" subject to state control, which is the fact that triggers the "political subdivision doctrine" in the first place. Though appointed by the state, Plaintiffs exercise a "federal function" in voting for President. *Burroughs*, 290 U.S. at 545. Thus, Plaintiffs have standing to challenge any action that interferes with the performance of that federal function.[1]

---

[1] The case law upon which the State relies is inapplicable. *See* State Br. 6–8. Some of the inapt citations involved claims by political subdivisions, which, by definition, cannot have "personal stakes" in a case. *See City of Hugo*, 656 at 1253 (plaintiff was a city in Oklahoma). Other inapt cases involved plaintiffs who did not suffer any personal loss but instead wished only to vindicate a purely abstract principle. In contrast, here, Plaintiffs here were actually removed from office (or threatened with removal) as a result of the Secretary's unconstitutional actions. *Compare Columbus & G. R. Co. v. Miller*, 283 U.S. 96, 100 (1931) (tax collector would not be personally affected by allegedly invalid tax provision); *Cooke v. Hickenlooper*, No. 13-cv-1300, 2013 U.S. Dist. LEXIS 168806, at *38 (D. Colo. Nov. 27, 2013) (county sheriffs not personally affected by allegedly unconstitutional new gun regulations and did not allege potential job loss).

**B.     Plaintiffs Have Stated A Claim That The Secretary Unconstitutionally Interfered With Plaintiffs' Right To Vote.**

On the merits, Plaintiffs have stated a claim for damages based on the Secretary's interference with Plaintiffs' performance of their federal duties. The text, history, and structure of the Constitution are clear: presidential electors exercise a "federal function," and, once appointed, may not be controlled in the exercise of their duties by either state or federal officials. Because the Secretary unconstitutionally interfered with that protected federal constitutional right, this Court must deny the State's motion to dismiss.

**1.     Colorado May Not Interfere With Electors' Performance Of Their Federal Function.**

The Secretary's actions were unconstitutional because they violate the long-established prohibition on state interference with the exercise of a "federal function." The federal nature of Plaintiffs' duty, already clear from the Constitution, has been repeatedly confirmed by the Supreme Court. In *Burroughs v. United States*, 290 U.S. 534 (1934), the Supreme Court held that presidential electors "exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States," and thus are not mere creatures of state law. *Id.* The Court later reaffirmed that "presidential electors exercise a federal function in balloting for President and Vice-President." *Ray v. Blair*, 343 U.S. 214, 224 (1952); *see also Bush v. Gore*, 531 U.S. 98, 112 (2000) (Rehnquist, C.J., concurring) (same, quoting *Burroughs*).[2]

Because casting an electoral vote for president is a federal duty, Colorado may not interfere with or impede the performance of that duty. The bedrock principle that states cannot

---

[2] As mentioned *supra* pp. 1–2, state and federal statutes mirror the Supreme Court's conclusion. *See* 3 U.S.C. § 8 ("[E]lectors shall vote for President and Vice President, respectively, in the manner directed by the Constitution."); CRS § 1-4-304(1) ("[P]residential electors shall proceed to perform the duties required of them by the constitution and laws of the United States.").

interfere with federal functions was first described in *McCulloch v. Maryland*, 17 U.S. 316 (1819), which rejected a state's ability to tax the Bank of the United States because the "Constitution and the laws made in pursuance thereof shall be the supreme law of the land" and cannot be interfered with by a state. *Id.* at 433. Since then, courts have held that federal postal officials may not be required to get a state driver's license to perform their duties because that would "require qualifications in addition to those that the [Federal] Government has pronounced sufficient," *Johnson v. Maryland*, 254 U.S. 51, 57 (1920); that private federal contractors cannot be required to submit to state licensing procedures that would add to a contractor's qualifications to receive the federal contract, *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189–90 (1956); and that federal employees and contractors cannot be prosecuted for trespass when performing "federal duties," *Wyoming v. Livingston*, 443 F.3d 1211, 1230 (10th Cir. 2006).

Here, the State implies presidential electors work for or on behalf of the state, calling them "state officers." State Br. 7. But electors are employees of no one. Unlike state employees, electors perform federal functions, are appointed pursuant to the U.S. Constitution, are elected to office, and receive only a nominal stipend and travel allowance as compensation. *See* CRS 1-4-304–305. Instead, as Hamilton noted, the Electoral College occupies a "branch" of government analogous to the House and Senate. *See* The Federalist No. 60 (A. Hamilton).

Even if Plaintiffs were nominally "state officials," the analysis would not change. Courts have granted immunity not just to federal employees but also to private contractors performing federal functions, *Leslie Miller*, 352 U.S. at 189–90; *Wyoming*, 443 F.3d at 1217; to private banks, *Nat'l Bank v. Commonwealth*, 76 U.S. 353, 362 (1870) (national banks must be free from any "State law [that] incapacitates the banks from discharging their duties to the government"); and, as particularly relevant here, to state legislative officials, whose votes to ratify a

constitutional amendment are not subject to overrule by popular referendum because the "act of ratification by the State derives its authority from the Federal Constitution." *Hawke v. Smith*, 253 U.S. 221, 230 (1920). Thus, Plaintiffs' performance of their federal function renders them immune from state control—not their employment status.

### 2. The Power To Appoint Does Not Imply The Power To Control.

The State also errs when it confuses its power to *appoint* electors with the power to *control* them. State Br. 9–12. The President "appoints" federal judges; he has no power to control federal judges. The same is true here: while the Constitution expressly grants states the power to "appoint" electors, the Constitution gives states no power to control how electors perform their "federal function." *See Hawke*, 253 U.S. at 230 (federal rules govern state ratification of constitutional amendments).

The difference between the power to appoint and the power to control is fundamental in our system of separated powers. Before the Senate was popularly elected, for instance, state legislatures had plenary power to select U.S. Senators. But, while any instructions on voting from a Senator's state may have had moral and political sway, "attempts by state legislatures to instruct senators have never been held to be legally binding." Saul Levmore, *Precommitment Politics*, 82 Va. L. Rev. 567, 592 (1996). Thus, no Senator was ever punished by a state for failing to follow an instruction, despite state legislators believing Senators worked for them.

The same principle also applies to legislative electors—that is, voters—who are the other type of "electors" mentioned by the Constitution. *See* U.S. Const. art. I, § 2; *see also infra* at 10. Legislative electors cannot be intimidated or coerced into voting in a particular way. *See*, *e.g*., 42 U.S.C. § 1973i. Indeed, the idea of a state law directing individual votes for Governor or Senator is so repugnant to the Constitution that it is unclear if it has ever even been attempted. Yet that is

exactly what the State did here. The interference would have been unconstitutional if Plaintiffs were legislative electors, and it is equally unconstitutional with respect to presidential electors.

*Ray v. Blair,* 343 U.S. 214 (1952), upon which the State relies, confirms the distinction between the State's power to appoint (which it has) and its power to control (which it lacks). In permitting the state to require electors to pledge to vote for the nominee of their party, *Ray* affirmed the plenary power of states to *appoint* electors. *Id.* at 231. But the Court also noted that electors' "promises" may be "legally unenforceable" because they could be "violative of an assumed constitutional freedom of the elector under the Constitution to vote as he may choose in the electoral college." *Id.* at 230 (citation omitted). This passage recognizes the key distinction between the state-regulated appointment process and the federal function of casting a vote for president that must be free from state interference.

### 3. The Constitution's Text Gives Electors Discretion To Choose Their Preferred Candidates.

The Constitution's text also demonstrates that states may not dictate electors' votes, as the Tenth Circuit seemingly recognized earlier in this dispute. In *Baca II*, the court stated that any attempt "to remove an elector after voting ha[d] begun" would be "unlikely in light of the text of the Twelfth Amendment," which gives "Electors" freedom to cast a "vote by ballot" without restriction. Slip Op. at 12 n.4, U.S. Const. amd. XII. The court's reliance on Constitutional text was well-founded.

The Constitution creates two kinds of "Electors." First, Article I, § 2 provides that House Members are selected every two years by "Electors," and the Seventeenth Amendment expanded the power of those "Electors" (hereinafter, "Legislative Electors") to include selection of Senators. States have the power to define Legislative Electors' qualifications, because Legislative Electors may cast votes only if they have the "Qualifications requisite for Electors of

the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2. But once qualified, Legislative Electors perform a federal function—selecting Members of the House and Senate—which the states have no power to direct or control. *See Ray*, 343 U.S. at 224 (comparing the "federal function" of a presidential elector to "the state elector who votes for congressmen"). Thus, no state has ever tried by law to specify how its Legislative Electors must vote in Congressional elections. The very idea is anathema to the liberty of voting.

Second, Article II, § 1 provides that a second set of "Electors" are "appoint[ed]" by the State, as the legislature "may direct," to select the President and Vice President once every four years. These are the Presidential Electors. The State has plenary power to select these Electors, except that no "Senator or Representative, or Person holding an Office of Trust or Profit under the United States" may serve as a Presidential Elector. As with Legislative Electors, Presidential Electors exercise a federally-protected power in performing their duties. *Burroughs*, 290 U.S. at 545 (presidential electors "exercise a federal function under . . . the Constitution").

The plain meaning of the constitutional text is that all "electors" are vested with judgment and discretion. The word "elector" implies choice: Samuel Johnson defined the term in 1768 as "he that has a vote in the choice of any officer." Samuel Johnson, *A Dictionary of the English Language* (3d ed. 1768). Further, in Federalist 57, Madison notes Legislative Electors "are to be the same who exercise the right in every State of electing the corresponding branch of the legislature of the State," The Federalist No. 57 (J. Madison). Presidential Electors have the same right because, as Alexander Hamilton said, Presidential Electors would likely have the "information and discernment" necessary to choose the President. The Federalist No. 68 (A. Hamilton). Indeed, Hamilton explicitly drew the analogy between Legislative and Presidential

Electors when he said that the Electoral College would form an "intermediate body of electors" who would be "detached" from "cabal, intrigue, and corruption." *Id.*

Other constitutional text confirms Electors' must exercise independent judgment. The Constitution requires Presidential Electors vote "by ballot," meaning Presidential Electors must vote by secret ballot to further insulate electors from the "cabal and intrigue" that concerned the framers. *See* Speech of Charles Pinckney in the United States Senate, March 5, 1800, *reprinted in* 3 Records of the Federal Convention 1787, at 390 ("The Constitution directs that the Electors shall vote by ballot . . . It is expected and required by the Constitution, that the votes shall be secret and unknown."). Secret ballots are inconsistent with the ability to control electors' votes, as illustrated dramatically here, where the Secretary removed Micheal Baca purely on the basis of his vote.[3] Compl. ¶ 55.

In line with this history, the Supreme Court has recognized that Presidential Electors were originally vested with judgment. In 1892, the Court stated that "it was supposed [by the Framers] that the electors would exercise a reasonable independence and fair judgment in the selection of the Chief Executive." *McPherson*, 146 U.S. at 36. Justice Jackson later agreed that "[n]o one faithful to our history can deny that the plan originally contemplated . . . that electors would be free agents, to exercise an independent and nonpartisan judgment." *Ray*, 343 U.S. at

---

[3] Indeed, when the Secretary refused to permit Plaintiffs to vote by secret ballot and interfered with electors' ability to certify and seal their own votes, he may have violated federal law governing electoral procedure. *See* 3 U.S.C. §§ 8–11 (requiring electoral votes be cast "in the manner directed by the Constitution," and providing "*electors* shall make and sign six certificates of all the votes given by them," without any interference from the State) (emphasis added).

11

232 (Jackson, J., dissenting).[4] No amendment or court opinion has altered the freedom that the Supreme Court has recognized, nor has any Supreme Court opinion. It therefore still exists.

### 4. Constitutional Structure Reinforces Elector Independence.

The Supreme Court has also made clear that the Constitution prohibits states from adding restrictions to electors' freedom to vote for candidates who meet constitutional qualifications. In *U.S. Term Limits v. Thornton,* 514 U.S. 779 (1995), for instance, the Court rejected Arkansas's attempt to deny ballot access to any representative who had served three terms in the U.S. House or two in the Senate. The Court held such restrictions infringed Legislative Electors' freedom of choice because "sovereignty confers on the people the right to choose freely their representatives to the National Government." *Id.* at 794. Similarly, in *Powell v. McCormack,* 395 U.S. 486 (1969), the Court held that Congress had no power to fail to seat an elected representative who met all constitutional requirements for congressional service. *Id.* at 547. Thus, under *Powell* and *Thornton*, Legislative Electors must be given freedom to vote into office anyone that meets the constitutional requirements of age, residency, and citizenship. *Thornton*, 514 U.S. at 783.

Presidential Electors have the same freedom of choice as Legislative Electors. The Constitution imposes only a few restrictions on Presidential Electors' choices: for example, at least one of an elector's choices for president and vice-president must not be from the elector's state, U.S. Const. amd. XII, and the elector's choice for president must be at least 35 years old, *id.* art. II, § 1. But the constitutional limits are the *only* limits on elector discretion, because to permit States to add additional restrictions would undermine "'the right of the electors to be

---

[4] Leading constitutional historian Rob Natelson recently reviewed additional founding-era evidence that electors were meant to exercise discretion in blog posts that can be found at https://perma.cc/SL3F-EPKR and https://perma.cc/DDW2-MDUV.

represented by men of their own choice," which is "so essential for the preservation of all their other rights.'" *Powell*, 395 U.S. at 534 n.65 (quoting 16 Parl. Hist. Eng. 589–90 (1769)). The restriction on voting here—which gave Presidential Electors one and only one choice for President, *see* Compl. ¶¶ 54–55—is thus unconstitutional.

Indeed, if states could restrict Presidential Electors' votes beyond express constitutional limits, then, as Justice Douglas said in *Powell*, nothing prevents the passage of laws that would nullify votes for a "Communist," a "Socialist," or anyone who "spoke[] out in opposition to the war in Vietnam." 395 U.S. at 553 (Douglas, J., concurring). Such politically-charged restrictions are not hypothetical: the New York legislature recently introduced a bill that would prevent its Presidential Electors from voting for a candidate who did not release copies of his or her five most recent years of tax returns. *See* N.Y. Senate Bill S26, § 3 (2017–18 Legislative Session). On the State's view here, that condition on elector voting is a valid component of the state's appointment power. But the Constitution's text and structure reveal that this extra-constitutional restriction on who Presidential Electors can select is invalid, just like the one at issue here.

### 5. Longstanding Practice Recognizes The Existence Of A Constitutional Freedom To Choose.

Finally, the State contends that "longstanding practice" justifies its deviation from the text and history of the Constitution. State Br. 12–14. But the State's argument confuses ethical norms with constitutional law. Of course the norm is for electors to vote consistent with the expectations of the public and political parties. Yet, as Senator Sam Ervin recognized on the floor of the Senate, the "Constitution is very clear on this subject" of the binding of Presidential Electors: the government may not "take what was an ethical obligation and convert it into a constitutional obligation." 145 Cong. Rec. 203 (1969). For that very reason, Congress has never wavered from its view that Presidential Electors' votes must be counted even if contrary to the

popular vote. Thus, in the most recent election, Congress certified seven such votes, including several from states with binding statutes like Colorado's that attempted to require Presidential Electors to vote for a particular ticket, *see* 163 Cong. Rec. H185–189 (Jan. 6, 2017) (counting and certifying election results). Congress has never done otherwise.

The State also claims that "courts have uniformly recognized the constitutionality of binding electors through statute." State Br. 12. The State is wrong. In fact, the Alabama Supreme Court invalidated a binding statute because, when the state "dictate[s] to the electors the choice which they must make for president and vice-president, it has invaded the field set apart to the electors by the Constitution of the United States." *Op. of Justices*, 250 Ala. 399, 401 (1948). The Kansas Supreme Court has likewise recognized that "[i]n a legal sense the people of this State vote for no candidate for President or Vice President, that duty being delegated to 10 citizens who are authorized to use their own judgment as to the proper eligible persons to fill those high offices." *Breidenthal v. Edwards*, 57 Kan. 332, 339 (1896).[5]

Moreover, cases on which the State relies incorrectly conclude the Constitution can be changed or amended based on prior practice. One trial court decision relied on by the State, *Thomas v. Cohen*, 146 Misc. 836 (N.Y. Sup. Ct. 1933), acknowledged that "the exact language of the Constitution" vests electors with discretion, but the judge departed from the "apparent meaning" of the Constitutional text because, in the court's view, common practice had "ripened" into a "bounden duty" of an elector to vote for a particular candidate. *Id.* at 839, 841.  But

---

[5] Recent scholarship on this topic also supports the view that presidential electors may not be bound to vote for a particular candidate. *See* Michael Stokes Paulsen, *The Constitutional Power of the Electoral College*, Public Discourse (Nov. 21, 2016) ("[C]onstitutionally, the electors may vote for whomever they please."); Robert J. Delahunty, *Is The Uniform Faithful Presidential Electors Act Unconstitutional?*, 2016 Cardozo L. Rev. De Novo 129, 153 ("[T]he Constitution protects the elector's discretion against efforts at legal compulsion.").

federal law is now clear that "'[p]ast practice does not, by itself, create power.'" *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)); *see also Ray*, 343 U.S. at 253 (Jackson, J., dissenting) (noting that "custom" is not "sufficient authority for amendment of the Constitution by Court decree"). The clear language of the Constitution has not been amended. Under it, Plaintiffs' constitutional rights were violated.

* * *

This Court earlier expressed concern that Presidential Electors who fail to vote in accord with the popular vote of their state "undermine the electoral process and unduly prejudice the American people." *Baca v. Hickenlooper*, D. Colo. No. 16-2986, Slip Op. at 16 (Dec. 21, 2016). Plaintiffs recognize that departing from the popular vote and an elector's pledge should be an extraordinary act. But the greater prejudice to the American people would be to ignore the Constitution. The Framers created an intermediate body of electors, imbued with the discretion to cast votes for the persons they viewed as best able to serve as President and Vice-President, in the hope that this hybrid system would produce excellent results. Until the Constitution is amended, the State must permit the system to operate as designed.

## CONCLUSION

The Motion to Dismiss should be denied.

Dated:      December 22, 2017

Respectfully submitted,

*/s/ Jason B. Wesoky*
Jason B. Wesoky
1331 17th St., Suite 800
Denver, CO 80202
Telephone:  303-623-9133
Fax:  303-623-9129
E-mail:  jason.w@hamiltondefenders.org

Lawrence Lessig
Jason Harrow
EQUAL CITIZENS
20 Armory Street
Brookline, MA 02446
lessig@law.harvard.edu
jason@equalcitizens.us

Attorneys for Plaintiffs

16

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 22nd day of December, 2017, a true and correct copy of the foregoing **PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION TO DISMISS** was filed with the Court via **CM/ECF** and served upon counsel for Defendant via method indicated:

<u>*Attorneys for Defendant:*</u>  via CM/ECF
Matthew D. Grove
LeeAnn Morrill
Grant Sullivan
Office of the Solicitor General
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, CO  80203
Telephone: 720-508-6157
                720-508-6359
                720-508-6349
Facsimile: 720-508-6041
Email:       matt.grove@coag.gov
                leeann.morrill@coag.gov
                grant.sullivan@coag.gov

                                        */s/ Kurt E. Krueger*
                                        Kurt E. Krueger, Paralegal

17