IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-01937-WYD-NYW

MICHEAL BACA, POLLY BACA, and ROBERT NEMANICH,
        Plaintiffs,
v.

COLORADO DEPARTMENT OF STATE,
        Defendant.

---

**REPLY IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**

---

Defendant, the Colorado Department of State ("Department"), submits this Reply in support of its Motion to dismiss the Second Amended Complaint under FED. R. CIV. P. 12(b)(1) and 12(b)(6).

## REPLY ARGUMENT

### I.      As former subordinate state officials, Plaintiffs lack standing under the political subdivision standing doctrine.

Plaintiffs contend that the doctrine of political subdivision standing—which provides that federal courts lack jurisdiction over certain controversies between political subdivisions and their parent states—is no hurdle to this Court's jurisdiction, because their "own personal constitutional rights" were infringed by the Department's enforcement of Colorado's binding statute. Doc. 46, p. 4. In support, Plaintiffs rely on *Coleman v. Miller*, 307 U.S. 433 (1939), where the Supreme Court determined that 20 of 40 Kansas state senators had standing to sue in an effort to maintain the effectiveness of their votes.

Plaintiffs confuse two discrete strands of standing jurisprudence: the political subdivision standing doctrine, which acts as an independent bar to Plaintiffs' suit, and the requirements for legislator standing. *Coleman* deals only with legislator standing and contains no discussion of the political subdivision standing doctrine. Because Presidential Electors do not legislate, *Coleman*

has no bearing on the Department's Motion to Dismiss. Moreover, even if *Coleman* were relevant, its holding has since been cabined by the Supreme Court in *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015). There, the Court concluded that the Arizona State Legislature had standing to challenge a voter initiative because it was "an institutional plaintiff asserting an institutional injury" in a suit authorized by votes taken in both the Arizona House and Senate. *Id.* at 2664. But the Court cautioned that the same is not true for individual legislators—they lack standing in part because they are not authorized to represent the legislature as a whole in litigation. *Id.* at 2664 (citing *Raines v. Byrd*, 521 U.S. 811 (1997)). The Tenth Circuit, applying *Arizona State Legislature*, has also held that individual state legislators lack standing to challenge state law. *See Kerr v. Hickenlooper*, 824 F.3d 1207, 1214–17 (10th Cir. 2016) (no standing to challenge TABOR). Plaintiffs' reliance on legislator-standing cases is thus misplaced. But this Court need not go down this legislator-standing rabbit hole. As discussed below, the political subdivision standing doctrine operates as an independent bar to Plaintiffs' standing.

Plaintiffs' response to the political subdivision standing doctrine is two-fold. *First*, Plaintiffs argue they are not "ordinary 'state officials'" that might otherwise trigger the doctrine because they exercise a "federal function." Doc. 46, p. 5. But merely exercising a "federal function" does not remove a state official from the political subdivision standing doctrine. After all, a county sheriff exercises a federal function when he or she assists in enforcing any number of federal laws; a state insurance commissioner exercises a federal function when he or she administers complementary state and federal insurance programs like Medicaid and Medicare; and a city government exercises a federal function when it applies for and receives federal dollars for local social programs and improvement projects. *See FERC v. Mississippi*, 456 U.S. 742, 762 (1982) (recognizing "the Federal Government has some power to enlist a branch of state government … to further federal ends."). Yet each of these subordinate officials and entities is barred by the political subdivision standing doctrine from maintaining federal litigation against their parent state. *See Donelon v. La. Div. of Admin. Law ex rel. Wise*, 522 F.3d 564, 566–67 (5th

2

Cir. 2008); *City of S. Lake Tahoe v. Calif. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 233–34 (9th Cir. 1980); *Cooke v. Hickenlooper*, No. 13-cv-01300-MSK-MJW, 2013 WL 6384218, *8–12 (D. Colo. Nov. 27, 2013). The same analysis applies here. Although their tenure was brief and their function purely ministerial, Plaintiffs' role as former subordinate state officials subjects them to the political subdivision standing doctrine, requiring dismissal for lack of standing.[1]

*Second*, Plaintiffs rely on a footnote in *Bd. of Educ. v. Allen* that found standing for certain local government board members because they held a "personal stake" in retaining their jobs. Doc. 46, p. 5 (citing 392 U.S. 236, 241 n.5 (1968)). But *Allen* did not discuss the political subdivision standing doctrine, perhaps because the appellees in that case did not contest the appellant's standing. *See id.* Moreover, serving as an elector in the Electoral College is not "a job" that confers any meaningful pecuniary interest or autonomous power on Plaintiffs. Under Colorado law, electors are reimbursed for their mileage, given a nominal five dollars for their attendance at the one-day meeting, and must cast their ballots for the candidates who won Colorado's popular vote. §§ 1-4-304(5) & 305, C.R.S. (2017). That's it. And as their Complaint makes clear, Plaintiffs' alleged injury is not an individual one based on the possible loss of this nominal compensation, but rather an institutional injury grounded in the diminution of power that Colorado's binding statute allegedly causes to the electors' official role. Doc. 39, ¶¶ 7–9, 41 (Plaintiffs' Complaint, identifying Plaintiffs in their capacities as Electoral College members and stating they determined to "exercise their constitutional discretion to vote contrary to their pledge

---

[1] Even putting aside Plaintiffs' positions as former state officials, exercising a "federal function" does not, by itself, confer federal constitutional rights that may be vindicated in federal court under 42 U.S.C. § 1983. More is required. The federal law that a plaintiff seeks to vindicate under § 1983 must clearly and unambiguously confer an individual federal entitlement by using rights-creating language. Vague "benefits" or "interests" will not do. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282–87 (2002) (holding that nothing short of an "unambiguously conferred right" will support a cause of action under § 1983); *Blessing v. Freestone*, 520 U.S. 329, 340 (1997) (stating that a plaintiff seeking redress under § 1983 "must assert a violation of a federal *right*, not merely a violation of federal *law*." (emphasis in original)). Nothing in Article II or the Twelfth Amendment fits that bill. *Cf. Jones v. Bush*, 122 F. Supp. 2d 713, 716–18 (N.D. Tex. 2008) (holding Twelfth Amendment did not confer standing on voters to enforce requirement that President and Vice President be inhabitants of different states).

or the popular vote in their state"); *cf. Pride v. Does*, 997 F.2d 712, 715 (10th Cir. 1993) (stating courts should "look to the substance of the pleadings and course of the proceedings" to determine if suit is against government official in their individual or official capacity).

Thus, because Plaintiffs do not assert any individual injury, *Allen*'s footnote does not confer standing on Plaintiffs. *See Cooke*, 2013 WL 6384218, *11 (concluding county sheriffs lacked standing to challenge state gun law because they failed "to bring claims in their individual capacities like that asserted in *Allen*.").

One additional facet of the political subdivision standing doctrine merits brief mention. Plaintiffs bring their challenge under Article II and the Twelfth Amendment of the Constitution, not a federal statute. Following the "trend" of other federal courts, the Tenth Circuit has stated that it will permit a lawsuit by a political subdivision against its parent state in the rare circumstance that the suit is "based on federal *statutes* that contemplate the rights of political subdivisions." *City of Hugo v. Nichols*, 656 F.3d 1251, 1258 (10th Cir. 2011) (emphasis added). But the Tenth Circuit warned that there is not a "single case where a court of appeals or the Supreme Court has expressly allowed … a claim by a municipality against its parent state premised on a substantive provision of *the Constitution*." *Id.* (emphasis added). The Tenth Circuit thus refused to depart from the "historic understanding of the Constitution as not contemplating political subdivisions as protected entities vis-a-vis their parent states." *Id.* at 1259. This Court should do the same, finding that Plaintiffs lack standing to assert constitutional claims against the Department.

**II.      Plaintiffs' federal preemption argument fails; Colorado's binding statute is fully consistent with federal law.**

Plaintiffs also resist dismissal by invoking federal preemption principles, asserting that Colorado's binding statute interferes with electors' performance of a "federal function." Doc. 46, pp. 6-8. In the cases Plaintiffs cite, a federal law or policy conflicted with, or was frustrated by, the operation of an incompatible state law. These are classic examples of conflict preemption. *See Leslie Miller, Inc. v. State of Arkansas*, 352 U.S. 187, 190 (1956) (stating Arkansas

contractor licensing law conflicted with "federal policy of selecting the lowest responsible bidder" for federal contractors); *Hawke v. Smith*, 253 U.S. 221, 225 (1920) (answering in the affirmative the question whether Ohio's law providing for ratification of constitutional amendments by referendum "is in conflict with article 5 of the Constitution of the United States"); *Wyoming v. Livingston*, 443 F.3d 1211, 1213 (10th Cir. 2006) (affirming dismissal of state prosecution against federal contractor because "the use of state prosecutorial power [would] frustrate the legitimate and reasonable exercise of federal authority").[2]

But the 29 state statutes that bind electors do not conflict with or frustrate any federal objective. To the contrary, state binding statutes *advance* federal objectives involving the Electoral College. *See N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 421 (1973) (rejecting federal preemption where "coordinate state and federal efforts" in a complementary framework pursue "common purposes"). Congress itself has passed a law binding the District of Columbia's electors to the result of the popular vote in the District. D.C. CODE ANN. § 1-1001.08(g)(2) (2017). The reason is straightforward and succinctly stated by Plaintiffs themselves: "sovereignty confers on *the people* the right to choose freely their representatives to the National Government." Doc. 46, p. 12 (quoting *U.S. Term Limits v. Thornton*, 514 U.S. 779, 794 (1995)) (emphasis added). Thus, as far as Congress is concerned, binding electors to the outcome of a jurisdiction's popular vote promotes federal objectives. It does not impede them. *See Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005) (stating courts "have a duty to accept the reading that disfavors pre-emption" when two plausible alternative readings exist).

The Constitution likewise embraces the notion that states may bind their electors and, if necessary, remove them. Article II provides that electors of each state shall be appointed "in such

---

[2] *Nat'l Bank v. Commonwealth*, 76 U.S. 353 (1870), cited in Plaintiffs' Response on page 7, supports the Department, not Plaintiffs. There, the Court affirmed the constitutionality of a Kentucky tax on shares of a national bank, stating that the tax "in no manner hinders [the bank] from performing all the duties of financial agent of the government." *Id.* at 363. Similarly here, Colorado's binding statute does not hinder the duty of presidential electors to act as "messengers" who "transmit the election returns" to Congress. *Spreckels v. Graham*, 228 P. 1040, 1045 (Cal. 1924). That is their "sole duty." *Id.*

manner as the legislature thereof may direct[.]" U.S. CONST. art. II, § 1. The State's "power and jurisdiction" over its electors is "plenary," *McPherson v. Blacker*, 146 U.S. 1, 35 (1892), "comprehensive," *id.* at 27, and "exclusive," *id.* at 35. And, contrary to Plaintiffs' argument, the power to appoint necessarily encompasses both the power to remove and to attach conditions. *See Burnap v. United States*, 252 U.S. 512, 515 (1920) ("The power to remove is, in the absence of statutory provision to the contrary, an incident of the power to appoint."); *Myers v. United States*, 272 U.S. 52, 175–76 (1926) (invalidating Tenure of Office Act that attempted to prevent President from removing executive officers); *cf. South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (stating Congress's power to spend money includes the power to "attach conditions"). The *state* office of presidential elector, unlike a federal judge and other federal official, enjoys no constitutional protection against removal or the attachment of conditions by the appointing authority. *Compare* U.S. CONST. art. II, § 4 (stating "civil officers of the United States" may be impeached only for "high crimes and misdemeanors"), *and* U.S. CONST. art. III, § 1 (federal judges shall hold their offices during "good behavior"), *with Ray v. Blair*, 343 U.S. 214, 224 (1952) (stating electors "are not federal officers or agents" and that they "act by authority of the state" that appoints them).

The Twelfth Amendment, on which Plaintiffs rely, also supports the State's authority to bind electors. It was enacted for the very purpose of facilitating Electoral College meetings in which electors would be bound to "carry out the desires of the people," without confronting the obstacles of the Electoral College of 1800 that ended in a tie. *Ray*, 343 U.S. at 224 n.11. Put another way, permitting the binding of electors was "the very thing … intended by th[e] [Twelfth] amendment." *Id.* at 229 n.15 (quoting 11 Annals of Congress 1289—1290, 7th Cong., 1st Sess. (1802)).

Accordingly, because Colorado's binding statute does not conflict with federal objectives, but rather advances them, Plaintiffs' preemption argument should be rejected.

### III.   Plaintiffs' originalist view of Article II ignores both this country's democratic history and the Twelfth Amendment.

Last, Plaintiffs argue that Article II's text, as shown by the Framer's original understanding of the Constitution, imbues electors with discretion to cast their Electoral College ballots for their preferred candidates, even if contrary to the wishes of their State's voters. As historical support, Plaintiffs rely on Alexander Hamilton's 1788 Federalist paper (No. 68), Samuel Johnson's 1768 dictionary definition of elector, and Senator Charles Pinckney's 1800 speech on the Senate floor, among other sources. Doc. 46, pp. 10–11. When coupled with Article II, Plaintiffs contend, these sources establish that electors are "vested with judgment and discretion." *Id.* at 10.

Plaintiffs' historical analysis misses the mark for at least two reasons. *First*, even if the Plaintiffs accurately describe the Framers' original understanding—a point the Department disputes, *see* Doc. 42, pp. 12–14—their contemplated oligarch system never came to pass. Instead, history proves that electors "were so chosen simply to register the will of the appointing power in respect of a particular candidate." *McPherson*, 146 U.S. at 36. This view "has prevailed too long and been too uniform" to justify a contrary approach. *Id.*; *see also Bush v. Gore*, 531 U.S. 98, 104 (2000) ("History has now favored the voter"); Doc. 42, pp. 12–14 (summarizing history of electors being bound and pledged to certain candidates). Moreover, any ostensible tension between the Framers' original understanding and this country's longstanding historical practice cannot diminish the State's plenary power over its electors. As the Supreme Court has explained, there is "no reason for holding that the power confided to the states by the constitution has ceased to exist because the operation of the [Electoral College] system has not fully realized the hopes of those by whom it was created." *McPherson*, 146 U.S. at 36. As such, the State's plenary, comprehensive, and exclusive power over its electors—bolstered by this country's democratic history and longstanding practice—defeats any conflicting intent held by the Framers.

*Second*, whatever the Framers' original understanding might have been, the Twelfth Amendment's plain language "materially chang[ed] the mode of election of president" established by Article II. 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1460 (1833). Because the Twelfth Amendment was ratified in 1804—years *after* the Framers approved Article II—it supplants the earlier text and historical sources relied upon by Plaintiffs. *See* Akhil Reed Amar, *Some Thoughts on the Electoral College: Past, Present, and Future*, 33 OHIO N. U. L. REV. 467, 469 (2007) ("It is the Twelfth Amendment's electoral college system, not the Philadelphia Framers', that remains in place today."); *see also* Lawrence Lessig, *Understanding Changed Readings: Fidelity and Theory*, 47 STAN. L. REV. 395, 407 (1995) (explaining that "the Twelfth Amendment directly changed the method for electing a president described in Article II" because it "change[d] constitutional text directly").[3] And, as already indicated, the Twelfth Amendment's entire purpose was to facilitate Electoral College meetings where electors are pledged and bound to their party's preferred candidates. *See Ray*, 343 U.S. at 224 n.11 & 229 n.15.

Accordingly, Plaintiffs' reliance on the Framers' alleged original understanding of Article II should be rejected.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed in its entirety with prejudice.

---

[3] Plaintiffs' reliance on the Tenth Circuit's cursory reference to the Twelfth Amendment in *Baca I* should also be rejected. Doc. 46, pp. 2–3 (citing *Baca v. Hickenlooper*, 10th Cir. No. 16-1482, Slip Op. at 12 n.4 (Dec. 16, 2016)). The Tenth Circuit's footnote is mere *dicta* and contains no analysis of the Twelfth Amendment's text or the historical reasons for its ratification. *See United States v. Villarreal-Ortiz*, 553 F.3d 1326, 1328 n.3 (10th Cir. 2009) (stating *dicta* is not binding). That is unsurprising since the Tenth Circuit's order, and the highly expedited briefing leading up to it, were produced in a matter of hours to avoid delaying the constitutionally-scheduled meeting of the 2016 Electoral College.

Respectfully submitted this 19th day of January, 2018.

CYNTHIA H. COFFMAN
Attorney General

*s/ Grant T. Sullivan*
*s/ Matthew D. Grove*
LEEANN MORRILL, 38742*
First Assistant Attorney General
MATTHEW D. GROVE, 34269*
Assistant Solicitor General
GRANT T. SULLIVAN, 40151*
Assistant Solicitor General

Public Officials Unit / State Services Section
Attorneys for Defendants
Ralph L. Carr Colorado Judicial Center
1300 Broadway, 6th Floor
Denver, Colorado  80203
Telephone:  720 508-6349
FAX:  720 508-6041
E-Mail: leeann.morrill@coag.gov
        matt.grove@coag.gov
        grant.sullivan@coag.gov
*Counsel of Record

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2018, I served a true and complete copy of the foregoing **REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS UNDER FED. R. CIV. P. 12(b)(1) AND 12(b)(6)** upon all parties through ECF:

Jason Wesoky
1331 17th Street, Ste. 800
Denver, CO 80202

Lawrence Lessig
Jason Harrow
Equal Citizens
20 Armory Street
Brookline, MA 02446
*Attorney for Plaintiffs*

*s/ Terri Connell*

9