IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.   17-cv-01937-WYD-NYW

MICHEAL BACA,
POLLY BACA, and
ROBERT NEMANICH,

      Plaintiffs,

v.

COLORADO DEPARTMENT OF STATE,

      Defendant.

---

## ORDER ON MOTION TO DISMISS

---

## I.    <u>INTRODUCTION</u>

      This matter is before the Court on Defendant's Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) filed November 8, 2017.  A response in opposition to the motion was filed on December 22, 2017, and a reply was filed on January 19, 2018. Thus, the motion is fully briefed.

## II.    <u>BACKGROUND</u>

      Plaintiffs are three of the nine presidential Electors for the State of Colorado. They allege that the Colorado Department of State ["Defendant"], acting through its Secretary, Wayne Williams ["Secretary"], and under color of state law, specifically Colo. Rev. Stat. § 1-4-304, threatened and intimidated them in the exercise of their federally protected rights as presidential Electors in the 2016 Electoral College.  (Second Am.

Compl., ECF No. 39, Introductory Paragraph.)  The Complaint seeks nominal damages for the infringement of a fundamental federal right and a declaration that Colorado's law that purports to bind Electors by requiring them to vote for the Presidential and Vice Presidential candidates that received the highest number of votes at the preceding general election, Colo. Rev. Stat. § 1-4-304(5), is unconstitutional.  (*Id.*)  Plaintiffs allege that the statute is unconstitutional on its face and as applied to Electors because it infringes on their right to vote as they see fit without coercion, citing Article II and the Twelfth Amendment to the United States Constitution.  (Second Am. Compl. ¶¶ 3-5.)

As to the facts relevant to the claims, Plaintiffs allege that on the day of the Electoral College, December 19, 2016, they took an oath over objections to cast their ballots for the Presidential and Vice-Presidential candidates who received the highest number of votes in this State in the preceding election.  (Second Am. Compl. ¶ 53.) Plaintiffs allege that "before the vote, Secretary Williams, both personally and through surrogates, stated that anyone who violated their oath may be subject to felony perjury charges for intentionally violating the oath."  (*Id.*)

Polly Baca and Robert Nemanich followed Colorado law by casting their Electoral College ballots for the Presidential and Vice-Presidential candidates who won Colorado's popular vote, Hillary Clinton and Timothy Kaine.  They assert, however, that they felt "intimidated and pressured to vote against their determined judgment" in light of the Secretary's actions and statements.  (Second Am. Compl. ¶ 56.)[1]  Micheal Baca,

---

[1] Plaintiffs allege in that regard that after learning of what many deemed to be credible allegations of foreign interference in the popular election (*id.* ¶¶ 37–38), Plaintiff Nemanich asked the Secretary "what would happen if" a Colorado elector did not vote for Clinton and Kaine who had received the most popular

however, crossed out Hillary Clinton's name on the pre-printed ballot and wrote in his

vote for John Kasich for President—a person who Defendant notes appeared on no

ballot, anywhere, as a presidential candidate in the November 8, 2016 general election.

(*Id.* ¶ 54.)  The Secretary, after reading Michael Baca's ballot, removed him from office,

refused to count his vote, referred him for a criminal investigation, and replaced him with

a substitute elector who cast a vote for Clinton.  (*Id.* ¶ 55.)  Plaintiffs contend that the

Secretary's actions—which they acknowledge are fully consistent with Colorado state

law—violated their federal constitutional rights.

Defendant argues that this Court lacks subject matter jurisdiction under Rule

12(b)(1) because Plaintiffs are former state officers who lack standing to challenge

Colorado law.  Even if that Article III hurdle is overcome, Defendant argues that

Plaintiffs' argument fails under Rule 12(b)(6) because the United States Constitution

does not bar a state from binding its presidential electors to the outcome of that state's

popular vote for President and Vice President.  To the contrary, Defendant asserts that

the Constitution's text, United States Supreme Court precedent, and this country's

longstanding historical practice contemplate that the states may attach conditions to the

office of a presidential elector.  Accordingly, Defendant argues that this case should be

dismissed.

I note that this is the second federal lawsuit that Plaintiffs Polly Baca and Robert

Nemanich have filed related to their roles as presidential electors in the 2016 Electoral

---

votes in Colorado.  (*Id.* ¶ 46.)  The Secretary, through the Colorado Attorney General's office, responded that Colorado law requires electors to vote for the ticket that received the most popular votes in the state, and an elector who did not comply with this law would be removed from office and potentially be subjected to criminal perjury charges.  (*Id.* ¶¶ 46–47.)

College.  The first action, *Baca v. Hickenlooper*, 16-cv-02986 ["*Baca I*"], was filed in December 2016, just 13 days before the 2016 Electoral College vote.  The plaintiffs argued in *Baca I*, as in this case, that Colorado's binding presidential elector statute, Colo. Rev. Stat. § 1-4-304(5), was unconstitutional because it forced the electors to cast their votes for Hillary Clinton and Timothy Kaine who won the majority of Colorado's votes or to be removed from their position.

The same day the complaint was filed in *Baca I*, the plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking to enjoin the defendants from enforcing Colorado's statute.  The motion was denied at a hearing on December 12, 2016 (ECF No. 19), and by Order of December 21, 2017 (ECF No. 27). The Order found that the plaintiffs did not have a substantial likelihood of prevailing on the merits of their claim and could not show that the other three elements required for a preliminary injunction were satisfied.  (ECF No. 27 at 5-12.)

The Tenth Circuit on appeal declined to disturb this decision, denying the plaintiffs' emergency motion for injunction pending appeal.  (December 16, 2016 Order, ECF No. 26 in *Baca I*.)  As Defendant notes, in the run-up to the Electoral College vote, several other courts also declined to enjoin similar state laws governing electors.  They found, as in *Baca I*, that the challengers were unlikely to succeed on the merits.  *See Chiafalo v. Inslee*, No. 16-36034, 2016 U.S. App. LEXIS 23392 (9th Cir. Dec. 16, 2016); *Chiafalo v. Inslee*, 224 F. Supp. 3d 1140, 1144-45 (W.D. Wash. 2016); *Koller v. Brown*, 224 F. Supp. 3d 871, 878 (N.D. Cal. 2016); *see also Abdurrahman v. Dayton*, No. 16-cv-4279 (PAM/HB), 2016 WL 7428193, *4 (D. Minn. Dec. 23, 2016).

The plaintiffs in *Baca I* dismissed the case without prejudice in August 2017.  The Complaint in this case was filed in December 2017.

III.    ANALYSIS

A.    Standard of Review

Defendant seeks to dismiss the case pursuant to Fed. R. Civ. P. 12(b)(1) and (6). Under Rule 12(b)(1), a complaint may be dismissed for lack of subject matter jurisdiction.  A motion to dismiss under Rule 12(b)(1) can be either a facial attack on the sufficiency of the allegations in the complaint as to subject matter jurisdiction or a challenge to the actual facts upon which subject matter jurisdiction is based.  *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).  A facial attack on the allegations as to subject matter jurisdiction "questions the sufficiency of the complaint."  *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995).  The court must "accept the allegations in the complaint as true."  *Id.*

As to a Rule 12(b)(6) motion to dismiss, the court must "accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff."  *Jordan-Arapahoe, LLP v. Bd. of County Comm'rs of Cnty. of Arapahoe*, 633 F.3d 1022, 1025 (10th Cir. 2011).  Plaintiff "must allege that 'enough factual matter, taken as true, [makes] his claim for relief ... plausible on its face.'"  *Id.* (quotation and internal quotation marks omitted).  "A claim has facial plausibility when the [pleaded] factual content [ ] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quotation omitted).

B.     The Merits of the Motion

1.     Standing

Defendant first argues that Plaintiffs lack standing to challenge Colo. Rev. Stat.

§ 1-4-304(5)—it asserts that Plaintiffs lack that necessary "personal injury fairly

traceable to the defendant's allegedly unlawful conduct [that is] likely to be redressed by

the requested relief." *DaimerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006).

Specifically, Defendant argues that the political subdivision standing doctrine bars

Plaintiffs' lawsuit  *See City of Hugo v. Nichols*, 656 F.3d 1251, 1255 (10th Cir. 2011).

Plaintiffs argue in response that this Court implicitly, and the Tenth Circuit

explicitly, rejected this standing argument in *Baca I* because Plaintiffs alleged that the

Secretary's actions "infringe[d] upon their *own personal constitutional* rights."  (*See*

*Baca I*, Tenth Circuit Op., ECF No. 26 at 7) (emphasis added).  Plaintiffs also contend

that the Tenth Circuit recognized that Plaintiffs have standing under *Coleman v. Miller*,

307 U.S. 433 (1939).

I disagree that the Tenth Circuit actually decided the standing issue in *Baca I*,

and I did not address standing in that case.  While the issue was raised in the motion to

dismiss filed by the defendants in that case (*Baca I,* ECF No. 35), the plaintiffs

voluntarily dismissed the case before the motion to dismiss was ruled on.  As to the

Tenth Circuit's decision, it accepted Plaintiffs' allegations that Colo. Rev. Stat. § 1-4-

304(5) infringed upon their personal constitutional rights "given the stage of the

proceedings" (on an emergency motion for an injunction) and "given the preliminary

record before us." (*Baca I*, ECF No. 26 at 7.)  While it cited *Coleman* as a basis for

-6-

standing, it did not definitively decide the issue of standing due to the stage of the case and lack of a record on the issue.[2]  Thus, I must address the standing issue.

I first find that Plaintiffs do not have standing under the *Coleman* decision.  In *Coleman*, the Supreme Court found that a group of state legislators had standing to prohibit the state from interfering with a legislative vote.  The Court held the senators' "votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification."  *Coleman*, 307 U.S. at 438.  It thus found that the senators had an adequate interest in the case, as they had "a plain, direct and adequate interest in maintaining the effectiveness of their votes."  *Id*.  Plaintiffs assert that their interest here is similar to that of the state legislators in *Coleman*:  as appointed electors for Colorado, they were entitled to have their votes cast and counted once voting began.

*Coleman*, however, was a case involving state legislators, rather than presidential electors as here, and it did not address the political subdivision standing doctrine raised by Defendant.  Even if *Coleman* is relevant given that it involved legislators' stating, I find that it does not provide a basis for standing to the individual electors in this case.  As Defendant correctly notes, its holding has since been cabined by the Supreme Court in *Arizona State Legislature v. Arizona Indep. Redistricting Comm'n*, 135 S. Ct. 2652 (2015).  There, the Court concluded that the Arizona State Legislature had standing to challenge a voter initiative because it was "an institutional

---

[2] Defendant notes that the Tenth Circuit's decision, and the highly expedited briefing leading up to it, were produced in a matter of hours to avoid delaying the constitutionally-scheduled meeting of the 2016 Electoral College.

plaintiff asserting an institutional injury" in a suit authorized by votes taken in both the

Arizona House and Senate.  *Id.* at 2664.  But the Court cautioned that the same is not

true for individual legislators—they lack standing in part because they are not

authorized to represent the legislature as a whole in litigation.  *Id.* at 2664 (citing *Raines*

*v. Byrd*, 521 U.S. 811 (1997)).  The Tenth Circuit has stated that the "rule of law" from

the *Arizona State Legislature* case "materially alters the jurisprudence on legislator

standing" and that individual state legislators now lack standing to challenge state law.

*Kerr v. Hickenlooper*, 824 F.3d 1207, 1214–17 (10th Cir. 2016) (no standing to

challenge TABOR).  Under this same analysis, individual electors would not have

jurisdiction to challenge state law.

Thus, I turn to the political subdivision standing doctrine to determine

Defendant's standing argument.  Under that doctrine, "federal courts lack jurisdiction

over certain controversies between political subdivisions and their parent states."  *City*

*of Hugo*, 656 F.3d at 1255.  The Tenth Circuit noted in the *City of Hugo* case that it had

not found "a single case in which the Supreme Court or a court of appeals has allowed

a political subdivision to sue its parent state under a substantive provision of the

Constitution."  *Id.* at 1257.  "Instead, courts have allowed such suits only when

Congress has enacted statutory law specifically providing rights to municipalities."  *Id*.

The political subdivision standing doctrine has been noted to be "an important

limitation on the power of the federal government."  *Cooke v. Hickenlooper*, No. 13-cv-

1300-MSK-MJW, 2013 WL 6384218, at *10 (D. Colo. Nov. 27, 2013).  As Chief Judge

Krieger of this court noted in the *Cooke* case:

It guarantees that a federal court will not resolve certain disputes between a state and local government. A political subdivision may seek redress against its parent state for violation of a state Constitution, but the political subdivision cannot invoke (nor can a federal court impose) the protections of the United States Constitution for individuals against a state.

*Id.*

The political subdivision standing doctrine applies both to political subdivisions of states such as cities and counties and to state officers. *See Cooke*, 2013 WL 6384218, at *9 (applying doctrine to county sheriffs). "The Supreme Court has held that state officials lack standing to challenge the constitutional validity of a state statute when they are not adversely affected by the statute and their interest in the litigation is official, rather than personal." *Donelon v. La. Div. of Amin. Law*, 522 F.3d 564, 566–67 (5th Cir. 2008) (citing *Cnty. Court of Braxton Cnty. v. West Virginia ex rel. Dillon*, 208 U.S. 192, 197 (1908)). "In another context, the Supreme Court made it clear that courts should not pass upon the constitutionality of a statute 'upon complaint of one who fails to show that he is injured by its operation .... Thus, the challenge by a public official interested only in the performance of his official duty will not be entertained.'" *Donelon*, 522 F.3d at 566 (quoting *Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288, 348 (1936)).

Here, I find that the Colorado presidential electors are state officials. *See Walker v. United States*, 93 F.2d 383, 388 (8th Cir. 1937) (finding that "presidential electors are officers of the state and not federal officers"); *Chenault v. Carter*, 332 S.W.2d 623, 626 (Ky. 1960) (holding that presidential electors are state officers under Kentucky law). While presidential electors "exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of United States", they "are not officers

or agents of the federal government." *Burroughs v. United States*, 290 U.S. 534, 545 (1934); *see also Ray v. Blair*, 343 U.S. 214, 224 (1952) ("The presidential electors exercise a federal function in balloting for President and Vice-President but are not federal officers or agents any more than the state elector who votes for congressman.").

Thus, I must address whether Plaintiffs have a personal stake in the litigation, rather than merely an official interest.  I note that the substance of their claim is that the State of Colorado violated their constitutional right to cast an electoral vote of their choice for president.  (*See* Resp. to Mot. to Dismiss at 3.)  Under the political subdivision standing doctrine, this would not confer standing on Plaintiffs, as Plaintiffs are seeking to exercise what they believe are the full extent of their *official* powers under federal and state law.  *Donelan*, 522 F.3d at 568.

As the Ninth Circuit aptly noted, "a public official's 'personal dilemma' in performing official duties that he perceives to be unconstitutional does not generate standing." *Thomas v. Mundell*, 572 F.3d 756, 761 (9th Cir. 2009).  The plaintiffs lose nothing by their having to vote in accordance with the state statute "'save an abstract measure of constitutional principle.'"  *Id.* (quotation omitted).  Their injury "is based upon their 'abstract outrage' at the operation" of the state statute they perceive to be unconstitutional.  *Id.* at 762; *see also Raines*, 521 U.S. at 829-30 (finding that members of Congress did not have standing to challenge the constitutionality of the Line Item Veto Act because they did not have a sufficient "personal stake" in the dispute, even though they argued that the Act caused an unconstitutional diminution of Congress' power, as the injury was "based on a loss of political power, not loss of any private

right"); *Smith v. Indiana*, 191 U.S. 138, 149 (1903) (a county auditor who argued that an Indiana property tax statute violated the Fourteenth Amendment had no personal interest in the litigation; "[h]e had certain duties as a public officer to perform. The performance of those duties was of no personal benefit to him. Their non-performance was equally so."); *Mesa Verde Co. v. Montezuma Cnty. Bd. of Equalization*, 831 P.2d 482, 484 (Colo. 1992) (holding that "political subdivisions of the state or officers thereof . . . lack standing to assert constitutional challenges to statutes defining their responsibilities.").

Plaintiffs argue, however, that they have standing under the political subdivision standing doctrine because they were personally injured by the State's act because they were either removed from office (Mr. Baca) or threatened with removal (Mr. Nemanich and Ms. Baca) for exercising their alleged constitutional rights.  Plaintiffs assert that the Supreme Court has held that the threat of or actual removal from office confers standing.  *Bd. of Education v. Allen*, 392 U.S. 236, 241 n.5 (1968) (state officials' "refusal to comply with [a] state law [that is] likely to bring their expulsion from office" gives them a "personal stake" sufficient to confer standing); *see also City of Hugo*, 656 F.3d at 1259-60 (citing this ruling in *Allen* but noting that "the sole discussion of the municipal entity's standing was contained in a footnote").

I find that *Allen* does not provide standing.  I first note that *Allen* did not discuss the political subdivision standing doctrine, perhaps because the appellees in that case did not contest the appellant's standing.  *See Allen*, 329 U.S. at 241 n. 5.  Moreover, I agree with Defendant that serving as an elector in the Electoral College is not "a job" or

"an office" that confers any meaningful pecuniary interest or autonomous power on Plaintiffs.  Under Colorado law, electors are reimbursed for their mileage, given a nominal five dollars for their attendance at the one-day meeting, and must cast their ballots for the candidates who won Colorado's popular vote.  Colo. Rev. Stat. §§ 1-4-304(5) & 305.  Once the meeting is done and the votes are cast, the electors' duties are over.  There is no ongoing "office" or "job" that the electors have and risk losing.

Moreover, as the Complaint makes clear, Plaintiffs' alleged injury is not an individual one based on the possible loss of this nominal compensation, but rather an institutional injury grounded in the diminution of power that Colorado's binding statute allegedly causes to the electors' official role.  (Compl., ¶¶ 7–9, 41.)   The "injury" that Plaintiffs allege from being removed (or threatened from being removed) as a Presidential elector is that they would lose the ability to cast their vote; the quintessential duty of their position.

While Plaintiffs argue that they are not ordinary state officials because they exercise a "federal function", this does not remove a state official from the political subdivision standing doctrine.  As Defendant notes, a county sheriff exercises a federal function when he or she assists in enforcing any number of federal laws; a state insurance commissioner exercises a federal function when he or she administers complementary state and federal insurance programs like Medicaid and Medicare; and a city government exercises a federal function when it applies for and receives federal dollars for local social programs and improvement projects.  *See FERC v. Mississippi*, 456 U.S. 742, 762 (1982) (recognizing "the Federal Government has some power to

enlist a branch of state government … to further federal ends."). Yet each of these subordinate officials and entities is barred by the political subdivision standing doctrine from maintaining federal litigation against their parent state. *See Donelon*, 522 F.3d at 566–67; *City of S. Lake Tahoe v. Calif. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 233–34 (9th Cir. 1980); *Cooke*, 2013 WL 6384218, at *8–12. Similarly, while the presidential electors may play a federal function in casting their vote, their role as subordinate state officials subjects them to the political subdivision standing doctrine.

Finally, as Defendant notes, Plaintiffs bring their challenge under Article II and the Twelfth Amendment of the Constitution, not a federal statute. Following the "trend" of other federal courts, the Tenth Circuit has stated that it will permit a lawsuit by a political subdivision against its parent state in the rare circumstance that the suit is "based on federal *statutes* that contemplate the rights of political subdivisions." *City of Hugo*, 656 F.3d at 1258 (emphasis added). But the Tenth Circuit warned that there is not a "single case where a court of appeals or the Supreme Court has expressly allowed … a claim by a municipality against its parent state premised on a substantive provision of the Constitution." *Id.* The Tenth Circuit thus refused to depart from the "historic understanding of the Constitution as not contemplating political subdivisions as protected entities vis-a-vis their parent states." *Id.* at 1259. This also supports my finding regarding lack of standing.

Accordingly, the motion to dismiss is granted as Plaintiffs lack standing to assert their claims.

2.    Whether Plaintiff's Complaint Must Be Dismissed for Failure to
State a Claim

Even if Plaintiffs have standing to pursue their claim, I find that their claims must

be dismissed for failure to state a claim upon which relief can be granted.  Presidential

electors "act by authority of the State, which receives its authority from the federal

constitution." *Blair*, 343 U.S. at 224.  The selection of presidential electors is provided

for in Article II of the Constitution.  Thus, Article II provides that "[e]ach state shall

appoint, *in such manner as the Legislature thereof may direct*, a number of electors,

equal to the whole number of Senators and Representatives to which the State may be

entitled in the Congress."  U.S. CONST., art. II, § 1, cl. 2 (emphasis added).  Nothing in

the Twelfth Amendment, or any other amendment, abrogates this state power.

Defendant argues that because the States alone have the power to appoint their

presidential electors, they necessarily possess the power to attach conditions to that

appointment and provide for removal.  Plaintiffs argue, on the other hand, that there is a

distinction between the power to appoint presidential electors and the power to control

them.  I agree with Defendant, and find that States have the power to attach conditions

to the electors' appointment.  The Supreme Court has held that "the state legislature's

power to select the manner for appointing electors is plenary"; they may "select the

manner for appointing electors" or "select the electors itself", and may "take back the

power to appoint electors."  *Bush*, 531 U.S. 98, 104 (2000).  Binding electors to the

outcome of the State's popular vote would appear to be one such permissible condition.

*See* Beverly J. Ross & William Josephson, *The Electoral College and the Popular Vote*,

12 J. L. & Politics 665, 678 (1996).  Indeed, this is the most popular condition, as 29 states and the District of Columbia have chosen to adopt it.  In the same vein, no constitutional provision bars a state from removing electors who refuse to comply with state law.

Moreover, the United States Constitution is silent as to Plaintiffs' argument that there is a distinction between the power to appoint presidential electors and the power to control them.  When the Constitution is silent, the power to bind or remove electors is properly reserved to the States under the Tenth Amendment.  U.S. CONST. amend. X; *see McPherson v. Blacker*, 146 U.S. 1, 35–36 (1892) (stating "exclusive" State power over "mode of appointment" of electors "cannot be overthrown because the States have latterly exercised in a particular way a power which they might have exercised in some other way"); *cf.* Matthew J. Festa, *The Origins and Constitutionality of State Unit Voting in the Electoral College*, 54 VAND. L. REV. 2099, 2145 (2001) ("[A]ny legislation that impinges on the states' discretion to use the [winner-take-all allocation of electoral votes] would seem to run into this very same Tenth Amendment problem").  Colorado has chosen to exercise that power and bind its presidential electors to the candidates who won the State's popular vote.  Colo. Rev. Stat. § 1-4-304(5).  Statutes are given a presumption of constitutionality.  *Gillmor v. Thomas*, 490 F.3d 791, 798 (10th Cir. 2007).  Plaintiffs have cited no case, and I am aware of none, finding Colorado's statute (or the similar statutes of other states and the District of Columbia), to be unconstitutional.

Notably, the Supreme Court upheld measures that bind presidential electors in circumstances that, while not identical, are similar to this case.  In *Ray v. Blair*, the

Alabama legislature delegated to the political parties the authority to nominate electors.

343 U.S. at 217 n.2. Alabama's Democratic Party required its nominees for electors to

pledge "aid and support" to the nominees of the National Convention of the Democratic

Party for President and Vice President. *Id.* at 215. The Supreme Court upheld this

pledge requirement, finding "no federal constitutional objection" when a state authorizes

a party to choose its nominees for elector and to "fix the qualifications for the

candidates." *Id.* at 231. Thus, the Court refused to recognize a constitutional right for

presidential electors to vote their individual preferences. While *Blair*'s holding does not

directly address the claims in this case, it strongly implies that state laws directly binding

electors to a specific candidate are constitutional. *See* Ross & Josephson, *The*

*Electoral College and the Popular Vote*, 12 J. L. & Politics at 696. Thus, if a state has

the power to delegate its power to bind electors, as *Blair* declared, it would appear that

it necessarily must have the authority to bind them itself and to enforce that binding.

Plaintiffs note, however, that the Supreme Court stated in *Blair* that electors'

"promises" may be "legally unenforceable" because they could be "violative of an

assumed constitutional freedom of the elector under the Constitution to vote as he may

choose in the electoral college." 343 U.S. at 230 (citation omitted). They argue that this

passage recognizes the key distinction between the state-regulated appointment

process and the federal function of casting a vote for president that must be free from

state interference. Further, they argue that the Constitution's text demonstrates that

states may not dictate electors' votes, as the Tenth Circuit seemingly recognized in

*Baca I*, wherein it stated that any attempt "to remove an elector after voting ha[d] begun"

would be "unlikely in light of the text of the Twelfth Amendment," which gives "Electors" freedom to cast a "vote by ballot" without restriction.  (*Baca I*, ECF No. 26, p. 12 n. 4) (citing U.S. CONST. amend. XII).  Plaintiffs assert that the court's reliance on Constitutional text was well-founded in light of the early construction of the Constitution in the Federalist Papers and other sources, wherein the electors were expected to exercise independent judgment.  I am not persuaded by Plaintiffs' argument.

First, to the extent that Plaintiffs rely on statements by the Tenth Circuit in *Baca I* that they argue support their position, those statements are dicta and are not binding.  *See United States v. Villarreal-Ortiz*, 553 F.3d 1326, 1328 n. 3 (10th Cir. 2009).  The Tenth Circuit did not actually decide whether Colorado's elector statute runs afoul of the Twelfth Amendment or the Constitution in general.  Moreover, the Tenth Circuit did not analyze the Twelfth Amendment's text or the historical reasons for its ratification.  Again, this is not surprising given the fact that the Tenth Circuit's Order was issued on an extremely expedited schedule to avoid delaying the scheduled meeting of the 2016 Electoral College.

Second, the Supreme Court in *Blair* rejected the argument "that the Twelfth Amendment demands absolute freedom for the elector to vote his own choice, uninhibited by pledge."  *Id.* at 228.  It stated that ["[i]t is true that the Amendment says the electors shall vote by ballot" but "it is also true that the Amendment does not prohibit an elector's announcing his choice beforehand, pledging himself."  *Id.*  It then stated:

> The suggestion that in the early elections candidates for electors—contemporaries of the Founders—would have hesitated, because of constitutional limitations, to pledge themselves to support party nominees in

the event of their selection as electors is impossible to accept.  History teaches that the electors were expected to support the party nominees. Experts in the history of government recognize the longstanding practice. Indeed more than twenty states do not print the names of the candidates for electors on the general election ballot.  Instead in one form or another they allow a vote for the presidential candidate of the national conventions to be counted as a vote for his party's nominees for the electoral college.  This long-continued practical interpretation of the constitutional propriety of an implied or oral pledge of his ballot by a candidate for elector as to his vote in the electoral college weighs heavily in considering the constitutionality of a pledge, such as the one here required, in the primary.

*Id.* at 228-30 (internal footnotes omitted).

*Blair* then went on to state the passage relied on by Plaintiffs, that "even if promises of candidates for the electoral college are legally unenforceable because violative of an assumed constitutional freedom of the elector under the Constitution, Art. II, s 1, to vote as he may choose in the electoral college, it would not follow that the requirement of a pledge in the primary is unconstitutional."  343 U.S. at 230.  It did not, however, actually decide that promises of candidates for the electoral college regarding a vote are unconstitutional, merely noting that this possibility would not change the result in that case.  I find it likely that the Supreme Court would find such promises constitutional in light of its recognition that, historically, the electors are expected to obey the will of the people.  343 U.S. at 230 n. 15.

Thus, *Blair* noted that while it "was supposed that the electors would exercise a reasonable independence and fair judgment in the selection of the chief executive", "experience soon demonstrated that" regardless of how they were chosen, "they were so chosen simply to register the will of the appointing power in respect of a particular candidate."  343 U.S. at 228-29, n. 16 (quoting *McPherson*, 146 U.S. at 36) (further

quotation and internal quotation marks omitted).  *Blair* also noted that historically, beginning even in the first election and continuing thereafter, the electors were "'not the independent body and superior characters which they were intended to. They were not left to the exercise of their own judgment: on the contrary, they gave their vote, or bound themselves to it, "according to the will of their constituents."'  *Id.* at 228 n. 15 (quoting 2 Story on the Constitution, 1463 (5th ed., 1891)).  The reason is that "'the people do not elect a person for an elector who, they know, does not intend to vote for a particular person as President.'"  *Id.* (quoting 11 Annals of Congress 1289–90, 7th Cong., 1st Sess. (1802)).  As Justice Story put it, "an exercise of an independent judgment would be treated, as a political usurpation, dishonourable to the individual, and a fraud upon his constituents."  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1457 (1833).  Plaintiffs' analysis focusing on what they claim was the Framers' original understanding of the role of electors under the Constitution ignores this history and the fact that the original understanding of the electors' roles never came to pass.

Moreover, any ostensible tension between the Framers' original understanding and this country's longstanding historical practice cannot diminish the State's plenary power over its electors.  As the Supreme Court has explained, there is "no reason for holding that the power confided to the states by the constitution has ceased to exist because the operation of the [Electoral College] system has not fully realized the hopes of those by whom it was created."  *McPherson*, 146 U.S. at 36.  The view that the electors were chosen to register the will of the appointing power "has prevailed too long and been too uniform" to justify a contrary approach.  *Id.*; *see also Bush v. Gore*, 531

U.S. at 104 ("History has now favored the voter"); *Williams v. Rhodes*, 393 U.S. 23, 34 (1968) ("the State is left with broad powers to regulate voting, which may include laws relating to the qualification and functions of electors").  As such, the State's plenary, comprehensive, and exclusive power over its electors—bolstered by this country's democratic history and longstanding practice—defeats any conflicting intent held by the Framers.  *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2559 (2014) (stating "long settled and established practice" deserve "great weight" in constitutional interpretation); *Ray*, 343 U.S. at 228 (citing to "longstanding practice" to uphold pledge requirement).

I also agree with Defendant that whatever the Framers' original understanding or intent was, the electors' role was "materially chang[ed]" by the Twelfth Amendment's plain language.  3 Joseph Story, *Commentaries on the Constitution of the United States* § 1460 (1833).  Under the original Constitution, "the electors ... did not vote separately for President and Vice-President; each elector voted for two persons, without designating which office he wanted each person to fill."  *Blair*, 343 U.S. at 224 n.11.  "The Twelfth Amendment was brought about as a result of the difficulties caused by that procedure."  *Id.*  In 1800, for example, the election ended in a tie because Democratic-Republican electors had no way to distinguish between Presidential nominee Thomas Jefferson and Vice-Presidential nominee Aaron Burr when they each cast two votes for President.  *See* Robert M. Hardaway, *The Electoral College and the Constitution*, 91–92 (1994).  Because that situation was "manifestly intolerable," *Ray*, 343 U.S. at 224 n.11, the Twelfth Amendment was adopted allowing the electors to cast "distinct ballots" for President and Vice-President.  U.S. CONST. amend. XII.  The Twelfth Amendment thus

permitted electors to be chosen "to vote for party candidates for both offices," allowing them "to carry out the desires of the people, without confronting the obstacles which confounded the elections of 1796 and 1800." *Blair*, 343 U.S. at 224 n. 11. It was the solution to the unique problems posed when electors are pledged and bound to the candidates of their declared party. Without that historical practice, dating back to at least 1800, the Twelfth Amendment would not have been necessary.

As noted earlier, 29 states, including Colorado, and the U.S. Congress have enacted legislation that codifies this historical understanding and longstanding practice. See National Conference of State Legislatures, *The Electoral College,* n. 3 (Aug. 22, 2016), *available at*: http://www.ncsl.org/research/elections-and-campaigns/the-electoral-college.aspx (last visited Nov. 5, 2017); D.C. CODE ANN. § 1-1001.08(g)(2). Multiple lower courts have found state elector statutes like Colorado's to be enforceable. *See Gelineau v. Johnson*, 904 F. Supp. 2d 742, 748 (W.D. Mich. 2012) ("Though the [*Blair*] Court was not in a position to decide whether the pledge was ultimately enforceable, the opinion's reasoning strongly suggested that it would be" and noting that the "constitutional history further supports this conclusion"; the Twelfth Amendment does not require party-ticket voting for President and Vice-President but "left that decision where it had been—with the states" who "have great latitude in choosing electors and guiding their behavior"); *Thomas v. Cohen*, 262 N.Y.S. 320, 324, 326 (Sup. Ct. 1933) (finding that electors may not vote for any qualified person and do not "possess such freedom of action"; "the electors are expected to choose the nominee of the party they represent, and no one else. The elector who attempted to disregard that duty could . . .

be required by mandamus to carry out the mandate of the voters of his State"; "the services performed by the presidential electors are purely ministerial, notwithstanding the language of the Constitution written 100 years ago"); *State ex rel. Neb. Republican State Cent. Comm. v. Wait*, 138 N.W. 159, 163 (Neb. 1912) (affirming writ of mandamus requiring the Secretary of State to print on the Republican line of the ballot the names of six replacement electors when the original Republican electors "openly declare[d]" they would vote in the Electoral College for another party's candidates, and finding that if the electors will not perform their duty, then the electors vacated their places as presidential electors).

The cases cited in the previous paragraph underscore what has been described as the "bounden duty" imposed on electors to vote in the Electoral College for the candidates who won the State's popular vote. *Thomas*, 262 N.Y.S. at 326. The *Thomas* court stated that so "sacred and compelling" is that duty—and so "unexpected and destructive of order in our land" would be its violation—that courts have recognized its performance amounts to a "purely ministerial" duty that may be compelled through a writ of mandamus. *Id.*; *see also Spreckels v. Graham*, 228 P. 1040, 1045 (Cal. 1924) (presidential electors' "sole function is to perform a service which has come to be nothing more than clerical—to cast, certify, and transmit a vote that already predetermined. It was originally supposed by the framers of our national Constitution that the electors would exercise an independent choice, based upon their individual judgment. But, in practice so long established as to be recognized as part of our unwritten law, they have been 'selected under a moral restraint to vote for some

particular person who represented the preferences of the appointing power', 'simply to register the will of the appointing power in respect of a particular candidate'   . . . .They are in effect no more than messengers. . . . .the sole public duty to be performed by them after the election involves no exercise of judgment or discretion and no portion of the 'sovereign powers of government' . . . ") (internal quotations omitted).  To the extent Plaintiffs have cited cases or authority to the contrary, including *Opinion of the Justices*, 250 Ala. 399 (Ala. 1948) and *Breidenthal v. Edwards*, 57 Kan. 332, 339 (1896), I do not find them persuasive for the reasons expressed in this Order.

Finally, I reject Plaintiffs' argument that Colorado's binding electoral statute interferes with the performance of a "federal function", *see Blair*, 343 U.S. at 224.  Thus, Plaintiffs argue that because casting a vote for president is a federal duty, Colorado may not interfere with or impede the performance of that duty.  Plaintiff cites to cases such as *Leslie Miller, Inc. v. State of Arkansas*, 352 U.S. 187 (1956).  In that case, a contractor in Arkansas was convicted of submitting a bid, executing a contract, and commencing work as a contractor without having obtained a license under Arkansas law for such activity.  *Id.* at 188.  The contractor and the United States as amicus curiae argued that the Arkansas statute requiring this license interfered with the Federal Government's power to select contractors and schedule construction and was in conflict with the federal law regulating procurement.  *Id.*  The Supreme Court agreed, noting the requirements of the Armed Services Procurement Act "that awards on advertised bids 'shall be made * * * to that responsible bidder whose bid, conforming to the invitation for bids, will be most advantageous to the Government, price and other factors

considered.'" *Id.* (quotation omitted). The relevant factors for making this determination were set forth in the Act and regulations. *Id.* at 188-89. Arkansas licensing law looked to similar factors to guide the Contractors Licensing Board. *Id.* at 189. The Supreme Court held:

> Mere enumeration of the similar grounds for licensing under the state statute and for finding 'responsibility' under the federal statute and regulations is sufficient to indicate conflict between this license requirement which Arkansas places on a federal contractor and the action which Congress and the Department of Defense have taken to ensure the reliability of persons and companies contracting with the Federal Government. Subjecting a federal contractor to the Arkansas contractor license would give the State's licensing board a virtual power of review over the federal determination of 'responsibility' and would thus frustrate the federal policy of selecting the lowest responsible bidder.

*Id.* at 189-90; *see also Johnson v. Maryland*, 254 U.S. 51, 57 (1920) (holding that federal postal officials may not be required to get a state driver's license to perform their duties because that would "require qualifications in addition to those that the [Federal] Government has pronounced sufficient. . .").

The rationale of those cases is not applicable here. The Federal Government has not taken action to determine the grounds for removal of presidential electors or what restrictions can be placed on electors, such as the requirement that they vote for the candidate who received the highest number of votes in the election as set forth in Colorado Rev. Stat. § 1-4-304(5). The Constitution is silent on these issues. It requires only that the states appoint the electors (which shall not include a senator or representative or person holding an office of trust or profit under the United States) and that the electors must "cast a ballot for President" (who must be at least 35) and Vice-

President, one of whom must not be an inhabitant of the same state as the elector. U.S. CONST. art. II, amend. XII.  As neither the Constitution nor federal law addresses the issues that Plaintiffs complain of in Colo. Rev. Stat. § 1-4-304(5), I find that the state law does not interfere either with the Constitution or federal policy.  I also find that it does not "frustrate the legitimate and reasonable exercise of federal authority." *Wyoming v. Livingston*, 443 F.3d 1211, 1213 (10th Cir. 2006).

As Defendant notes, the state elector enjoys no constitutional protection against removal by the appointing authority, unlike "civil officers of the United States who may be impeached only for "high crimes and misdemeanors" and federal judges who hold their office during "good behavior."  U.S. CONST. art. , § 4; art. III, § 1.  And the Supreme Court has held that "[t]he power to remove is, in the absence of statutory provision to the contrary, an incident of the power to appoint."  *Burnap v. United States*, 252 U.S. 512, 515 (1920).  The Supreme Court has also held that electors "act by authority of the state" that appoints them.  *Blair*, 343 U.S. at 224.  And the state's "power and jurisdiction" over its electors is "plenary", "comprehensive", as in "conveying the broadest power of determination", and "exclusive[]".  *McPherson*, 146 U.S. at 27, 35. Thus, it appears that states play, at least, a coordinate role with the federal government in connection with the electors.  *See N.Y. State Dep't v. Dublino*, 413 U.S. 405, 421 (1973) ("Where coordinate state and federal efforts exist within a complementary . . . framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one.")

-25-

Finally, Congress itself has passed a law binding the District of Columbia's electors to the result of the popular vote in the District.  D.C. CODE ANN. § 1-1001.08(g)(2) (2017).  Thus, it would appear that as far as Congress is concerned, binding electors to the outcome of a jurisdiction's popular vote promotes federal objectives.  And this also appears to be consistent with the history of the Twelfth Amendment, as discussed earlier.  As *Blair* noted, the very thing intended by the Twelfth Amendment was to bind an elector to the popular vote, as "the people do not elect a partisan for an elector who, they know, does not intend to vote for a particular person as President."  343 U.S. at 224 n. 15.[3]  Accordingly, I reject Plaintiffs' argument that Colorado's binding electoral statute interferes with the performance of a federal function.

IV.    <u>CONCLUSION</u>

In conclusion, Plaintiffs ask this Court to strike down Colorado's elector statute that codifies the historical understanding and longstanding practice of binding electors to the People's vote, and to sanction a new system that would render the People's vote merely advisory.  I reject this invitation, finding not only that Plaintiffs lack standing but that their claims fail to state a claim upon which relief can be granted.  Accordingly, it is

---

[3] *Nat'l Bank v. Commonwealth*, 76 U.S. 353 (1870), cited in Plaintiffs' Response on page 7, also supports Defendant's argument, not Plaintiffs. There, the Court affirmed the constitutionality of a Kentucky tax on shares of a national bank, stating that the tax "in no manner hinders [the bank] from performing all the duties of financial agent of the government." *Id.* at 363.  Similarly here, Colorado's binding statute does not hinder the duty of presidential electors to cast a ballot and perform their constitutional roles. Indeed, the statute requires the presidential electors to "perform the duties required of them by the constitution and laws of the United States."  Colo. Rev. Stat. § 1-4-304(1).

ORDERED that Defendant's Motion to Dismiss Plaintiff's Complaint Under Rules 12(b)(1) and 12(b)(6) filed on May 1, 2015 (ECF No. 23) is **GRANTED**, and Plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

Dated:  April 10, 2018

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge